## EXHIBIT A

State of Illinois )
                               ) ss
County of St. Clair )

### UNSWORN DECLARATION UNDER PENALTY OF PERJURY
### IN SUPPORT OF COMPLAINT FOR FORFEITURE

I, Kevin Thebeau, do hereby depose and declare under penalty of perjury the following:

At all times relevant herein, I have been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). The contents of this Declaration are based on information provided to me during the course of my investigation from participants in the criminal activity, from other witnesses, and from other law enforcement officers.

1. On January 25, 2017, officers observed a black 2017 Chevy Traverse traveling west near the 35 mile marker on Interstate 64. It appeared to officers that the vehicle was travelling under the posted speed limit.

2. While traveling next to the vehicle, officers observed that the occupant appeared overly nervous due to her arms being locked in the ten and two position on the steering wheel and due to her staring straight ahead and avoiding eye contact with officers.

3. While traveling in heavy traffic, officers observed the Chevy Traverse approach another vehicle and begin traveling less than one car length behind the vehicle, making the stopping distance unsafe for travel. Officers activated the emergency lights and conducted a traffic stop on the Chevy Traverse on Interstate 64 near the 9 mile marker for the offense of following too closely.

4. TFO Matt Plassman (TFO Plassman) approached the vehicle on the passenger side and advised the driver of the reason for the stop. TFO Plassman requested the driver produce her driver's license. The driver produced a California driver's license which identified her as Maria M.

MUTRUX. Officers conducted a computer check through law enforcement databases.

5. TFO Plassman asked MUTRUX about her travels. MUTRUX said she was in St. Louis (Missouri) visiting family. TFO Plassman asked MUTRUX why she was traveling west on Interstate 64. MUTRUX paused and replied that she had actually been at the Women's March in Washington D.C. and had stayed in Kentucky on the night of January 24, 2017. TFO Plassman asked MUTRUX where she was heading to now and MUTRUX advised she was actually now traveling to see family in St. Louis. While at the vehicle, TFO Plassman noticed there was a large amount of luggage in the vehicle for one person. TFO Plassman asked MUTRUX for the vehicle rental agreement. MUTRUX handed TFO Plassman a copy of a citation, which MUTRUX had received for improper lane usage on January 18, 2017, in New Mexico where she had been traveling east on Interstate 40. After speaking with MUTRUX, TFO Plassman advised MUTRUX that he would be issuing her a warning for the offense. TFO Plassman then returned to his patrol vehicle.

6. TFO Plassman advised affiant that he thought that MUTRUX was nervous because she would pause and think about each question before answering. TFO Plassman further advised affiant that he thought it was also suspicious that MUTRUX has a large amount of luggage in her vehicle for one person and when asked for her rental agreement she handed TFO Plassman a copy of a citation which she had received on January 18, 2017 in New Mexico where she had been traveling east on Interstate 40.

7. At that time, the computer check of MUTRUX indicated a criminal history for Driving Under the Influence. MUTRUX had a valid driver's license and was clear of any warrants.

8. Officers reviewed MUTRUX's rental agreement, which stated she had rented the vehicle in St. Helena's, California on January 9, 2017, which was nine days prior to her being

stopped in New Mexico. Officers believed that was suspicious because it was financially infeasible that someone would rent a high-end rental nine days prior to a cross country trip. Based on the traffic violation, MUTRUX's inconsistent answers, her behavior and the amount of luggage in the vehicle, officers believed that MUTRUX may be involved in illegal activity and decided to ask for consent to search the rental vehicle.

9. TFO Plassman returned to MUTRUX's vehicle and gave her a verbal warning concerning the traffic violation. TFO Plassman then asked MUTRUX if there were any illegal narcotics or large sums of currency in the vehicle. MUTRUX advised there was not. TFO Plassman then asked MUTRUX if she would consent to a search of her vehicle and she advised she would not and that she wanted to get on her way. MUTRUX stated that she had an eye doctor appointment in St. Louis at a Lens Crafter to get her eye glasses replaced because she had lost her glasses in Kansas City on her trip out "east." TFO Plassman had noticed that MUTRUX's driver's license had a restriction on it stating she must wear corrective lenses when operating a vehicle.

10. TFO Plassman advised MUTRUX that he believed that there was illegal contraband in the vehicle and requested a K-9. TFO Plassman advised MUTRUX that she was free to go, but her vehicle would need to remain at the current location until the K-9 could arrive on the scene. MUTRUX stated that she would remain with the vehicle. A short time later, TFO Kale Pirtle (TFO Pirtle) and TFO Jesse Fulkerson (TFO Fulkerson) arrived on scene with TFO Pirtle's K-9 Dallas.

11. TFO Pirtle spoke with MUTRUX who stated there was no contraband in the vehicle. TFO Pirtle then deployed K-9 Dallas to conduct the vehicle search. During K-9 Dallas' search, TFO Pirtle observed a hard fast head-turn, change in breathing, short quickened steps and tail wagging as K-9 Dallas approached the trunk of the vehicle. K-9 Dallas then began trying to crawl

3

under the vehicle, sniffing the undercarriage and continuing to wag his tail. K-9 Dallas began scratching at the trunk of the vehicle, which is his trained response to narcotic odors. TFO Pirtle advised that K-9 Dallas had given a positive alert to the odor of narcotics emitting from the vehicle.

12. TFO Pirtle explained to MUTRUX that the officers now had probable cause to search her vehicle and were going to conduct a search. Upon opening the rear hatch of the vehicle, officers observed a large gray Nautica suitcase with a green stripe. Upon opening the Nautica suitcase, officers observed that it only contained a smaller maroon Samsonite suitcase which was also empty. The Nautica and Samsonite suitcases were removed from the vehicle and placed on the ground. Officers then observed a large blue suitcase which contained clothing and what appeared to be homemade soap. Under the clothing officers observed a tan Burberry shopping type bag which contained a large sum of United States currency. The currency was bundled and the bundles were secured with bank bands.

13. A further search of the vehicle revealed a small, gold in color round tin, which contained a small amount of a green leafy substance which had the odor of raw cannabis and a container of lip balm which was infused with cannabis. These items were located by TFO Pirtle in a brown purse located on the passenger's seat of MUTRUX's rental vehicle.

14. At this time, MUTRUX and the vehicle were transported to the DEA Fairview Heights Office, where a more thorough search could be conducted in a safer environment and also to conduct an interview of MUTRUX.

15. Upon arriving at the DEA Fairview Heights Office, TFO Fulkerson and TFO Pirtle placed MUTRUX into an interview room. Officers also continued their search of MUTRUX's vehicle. While searching the vehicle, TFO Plassman located an amount of United States currency

4

in the same purse that the tin and lip balm were located.

16. After relocating the vehicle to the parking lot of the DEA Fairview Heights Office, TFO Pirtle placed the empty Nautica and Samsonite suitcases next to the vehicle and deployed K-9 Dallas. As K-9 Dallas walked by the suitcases, TFO Pirtle observed a hard fast head turn. K-9 Dallas immediately began scratching at the empty suitcases, indicating a positive alert for the odor of narcotics.

17. TFO Fulkerson then placed the United States currency in a black plastic trash bag and placed two other black plastic trash bags containing bundles of napkins in the parking lot of the DEA Fairview Heights Office. TFO Pirtle did not know which bag contained the United States currency prior to the search. TFO Pirtle deployed K-9 Dallas to conduct the money sniff. TFO Pirtle observed visceral and emotional responses, such as quickened breathing, hard and fast head turn towards the odor, and tail wagging, as K-9 Dallas sniffed the first bag. K-9 Dallas scratched at the first bag, ripping it open and exposing the United States currency, which is his trained response to narcotics odors.

18. Officers conducted an interview of MUTRUX. MUTRUX was read her Miranda rights and agreed to speak with officers concerning the seized currency. MUTRUX advised that she left her residence in St. Helena, California and drove to the "east coast" to attend the Women's March and sell a painting to a man named Max. MUTRUX stated she had located Max on Craigslist and did not know his last name. MUTRUX advised that Max had agreed on a purchase price for the painting and agreed to meet at a restaurant in Albany, New York. MUTRUX said she met Max at the unknown restaurant on January 22, 2017 to complete the transaction. MUTRUX stated that while at the restaurant, they walked out to the parking lot and Max viewed the painting

and agreed once again to purchase it. MUTRUX advised that she and Max then agreed to go to a local hotel room to complete the transaction. MUTRUX stated that upon arriving at the hotel Max brought the money, which was inside shopping bags, into the hotel room. MUTRUX stated that the money bundles which officers seized had the bank bands on them at the time of the transaction. MUTRUX told officers she then started her travel back to her home, but was stopped by a winter storm in Connecticut where she stopped and spent the night. MUTRUX believed she then drove to Kentucky and spent the night before being stopped in Illinois. Officers asked if the seized currency was the currency she had received from Max. MUTRUX stated it was. Officers asked MUTRUX how much money was seized and she stated something close to one hundred thousand, but she had taken some out to spend. TFO Plassman advised MUTRUX that a smaller amount of currency was located in a brown purse in the rental vehicle and MUTRUX advised that was also her money which was for travel expenses. Officers then asked if the gold tin containing the cannabis and the cannabis lip balm belonged to her and she advised they did.

19. TFO Plassman asked MUTRUX why the K-9 would indicated on the odor of narcotics from the two empty suitcases located in her rental vehicle and she paused and took a deep breath. Officers advised MUTRUX that they believed the MUTRUX had transported cannabis to the east coast from California and that officers had seized the proceeds from the sale of that cannabis. After a long pause, MUTRUX agreed with officers and advised that she had grown the cannabis at her home in California and sold it to an individual that she did not wish to disclose. MUTRUX confirmed that the seized currency was from the sale of the cannabis.

19. Based on the foregoing, declarant further believes that the subject-matter $99,480.00 in United States Currency is property which constitutes money furnished or intended to be furnished

by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. § 801 *et seq.*

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of June, 2017.

*Kevin Thebeau*
KEVIN THEBEAU
Task Force Officer
Drug Enforcement Administration